David Sturgeon-Garcia, Esq.
THE LAW OFFICES OF DAVID STURGEON-GARCIA
1100 Moraga Way, Suite 208
Moraga, CA 94556
Telephone:  925.235.7290

Attorneys for Plaintiff
Janice Alzado-Lotz

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

JANICE ALZADO-LOTZ;

                    Plaintiff,

vs.

MUTUAL SECURITIES, INC.; AARON
JASPER; MITCHELL VOSS; RYAN
SABOL; NICHOLAS DAMIANI; JULIE
COHEN; THOMAS BOCK; MARY
EVANS.

                    Defendants.

Case No.:  20-cv-2928

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

## I.  INTRODUCTION

1.      Plaintiff, Ms. Janice Alzado-Lotz, entrusted her retirement savings to Defendants, who blatantly disregarded numerous securities laws and regulations, and decimated Plaintiff's retirement account.  Defendants knew from their own documents that Ms. Alzado had "limited" investment knowledge and that, due to her age and station in life (she is a 66 year old widow), the investment objectives she wanted to govern her account were "*Capital Appreciation*" (but *not* the riskier "Trading Profits" or "Speculation"), and that she was only prepared to accept "*Moderate Risk*."  Defendants ignored her written instructions, and breached their duty of care, by investing all of her account savings in undiversified, high risk, wildly speculative foreign mining stock.  In fact, most of the securities Defendants purchased into Ms. Alzado's account were extremely high

- 1 -
**COMPLAINT**

risk over-the-counter securities ("OTC stock").[1]

2.      Defendants concealed their bad acts by failing to disclose to Ms. Alzado any material information relating to the investments they were buying into her account, and by continuously assuring her that everything was fine.  Everything was not fine.  Unbeknownst to Plaintiff, Defendants had disregarded her written instructions and implemented a systematic "one size fits all" investment strategy which consisted of uniformly investing clients' assets in high risk and wildly speculative foreign mining OTC stocks regardless of client profiles.  They failed to employ a diversified strategy at any time, failed to avoid wildly speculative OTC stocks, failed to make adjustments to their clients' portfolios to reflect current market conditions, and failed to disclose that they were self dealing in these same securities.  As a result, their clients' portfolios suffered losses year, after year, after year, until decimated.

## II.      THE PARTIES

3.      Plaintiff Janice Alzado-Lotz ("Ms. Alzado" or "Plaintiff") is the owner and beneficiary of the IRA that is the subject of this claim, which Defendants managed from approximately February 2011 to February 2019.  She lives in Littleton, Colorado.

4.      Defendant Mutual Securities, Inc. ("MSI") is a California broker-dealer firm regulated by the Financial Industry Regulatory Authority ("FINRA")(CRD#13092).  MSI provides brokerage and financial advisory services to clients, including Ms. Alzado, and conducts a range of securities transactions through its registered representatives.  MSI's main office is located in Camarillo, California, but it does business in Colorado.

---

[1] "OTC Equity Securities" are defined in FINRA Rule 6420(f).  They are traded through a dealer network rather than through a centralized formal exchange, such as the NYSE or Nasdaq. Because they are not required to report to the SEC, many OTC stocks are either penny stocks or are offered by companies with bad credit records.  OTCs tend to be closely held, extremely small and/or thinly traded.  Many of these companies do not file periodic reports or audited financials, making it very difficult for investors to find current, reliable information about those companies.  For these reasons, OTCs can be among the most risky investments.  MSI's own Written Supervisory Procedures Manual acknowledges that OTC stocks are non-conventional investments requiring a heightened level of scrutiny, characterizing them as "higher risk," "subject to volatile price changes," and "difficult to liquidate."

5.      Defendant Aaron T. Jasper ("Jasper") is a member of FINRA (CRD#5016734) and is the President/Chief Executive Officer of Defendant MSI.  As President and CEO of MSI, Jasper had "ultimate responsibility" for establishing and supervising the activities of MSI.  The SEC and FINRA have repeatedly confirmed that ultimate responsibility for supervision of the trading activities at a member firm rests with the firm's president and other senior management.  Jasper is personally accountable to Plaintiff for the bad acts described herein.

6.      Defendant Mitchell C. Voss ("Voss") is a member of FINRA (CRD#1029100) and is a Director/former President of Defendant MSI.  As President of MSI during part of the relevant period, Voss was responsible for supervising the compliance department, and had "ultimate responsibility" for establishing and supervising the activities of MSI.  The SEC and FINRA have repeatedly confirmed that ultimate responsibility for supervision of the trading activities at a member firm rests with the firm's president and other senior management.  Voss is personally accountable to Plaintiff for the bad acts described herein.

7.      Defendant Ryan S. Sabol ("Sabol") is a member of FINRA (CRD#4419285) and is the Vice President/Managing Director of Defendant MSI.  Sabol has been identified by MSI and its Chief Compliance Officer as a designated supervisor of the registered representatives directly responsible for Ms. Alzado's account.  According to FINRA regulatory filings, Sabol was also the designated Office of Supervisory Jurisdiction ("OSJ") Supervisor for the Denver OSJ/MSI Brach Office at issue in this case.  Sabol is personally accountable to Plaintiff for the bad acts described herein.

8.      Defendant Nicholas A. Damiani ("Damiani") is a member of FINRA (CRD#5669491) and is Executive Vice President/ Chief Operating Officer of Defendant MSI.  Damiani has been identified by MSI and its Chief Compliance Officer as a designated supervisor of the registered representatives directly responsible for Ms. Alzado's account.  Damiani is personally accountable to Plaintiff for the bad acts described herein.

9.      Defendant Julie Cohen ("Cohen") is a member of FINRA (CRD#1424275) and is the Chief Compliance Officer of Defendant MSI.  As CCO, Cohen is personally responsible for

establishing and maintaining MSI's supervisory procedures.  Cohen has also acknowledged that she separately acted as a designated supervisor of the registered representatives directly responsible for Ms. Alzado's account.  Cohen failed to fulfill her responsibilities, ignored red flags, and repeatedly failed to perform compliance functions for which she was directly responsible.  Cohen is personally accountable to Plaintiff for the bad acts described herein.

10.     Defendants Thomas H. Bock ("Bock")(CRD# 806182)("Bock") and Mary C. Evans ("Evans")(CRD# 1091961) ("Evans") were Registered Representatives and Securities Principals of MSI.  Bock and Evans operated out of an MSI office in Denver, Colorado, which MSI designated as an OSJ and as a "MSI Broker-Dealer Branch Office."  Bock and Evans are personally accountable to Plaintiff for the bad acts described herein.

11.     Defendants represented to Ms. Alzado that Bock and Evans were Registered Representatives and Securities Principals of MSI, and that MSI would supervise them in accordance with applicable FINRA Rules.  Unbeknownst to Ms. Alzado, Bock and Evans "resigned" as Registered Representatives in 2015 following the filing of a Class action lawsuit. Defendants concealed this information, and continued to act as if nothing had changed.  MSI continued to act as broker-dealer on Ms. Alzado's account, and continued to cause losses to Ms. Alzado's account.

### III.     JURISDICTION AND VENUE

12.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated under the Exchange Act.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and under 28 U.S.C. §1391(b)(2), because Plaintiff resides in this District and this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, including the dissemination of materially false and misleading information.

14.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

## IV.   AGENCY, AIDING AND ABETTING, CONSPIRACY and CONTROL PERSON LIABILITY

15.     Defendants are primarily liable for their own misconduct and vicariously liable for the acts and omissions of their registered representatives, officers, agents and employees under well-established legal principles, such as *respondeat superior*, control person liability under Section 20 of the Securities Exchange Act of 1934, actual and/or ostensible authority, aiding and abetting, conspiracy, and under FINRA's Rules regarding supervision.

16.     Each Defendant was the actual or ostensible agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.

17.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts and transactions that are the subject of this Complaint.

18.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and were aware of their overall contribution to and furtherance of the wrongdoing.

19.     Defendants were also "Control Persons" under Section 20, 15 U.S.C. §78t, which states in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

In the context of this Section, "brokerage firms *control* their brokers and registered representatives."  *Landry v. Hemphill, Noyes & Co., Inc.,* 473 F.2d 365 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S. Ct. 356, 38 L. Ed. 2d 237 (1973).  As demonstrated below, Defendants failed to maintain or enforce a reasonable and proper system of supervision and internal control over controlled persons so as to prevent violations of §10(b) and Rule 10b-5.

## V.      FACTUAL BACKGROUND

### A.  Ms. Alzado's Documented Account Profile

20.      Ms. Alzado opened the subject account with MSI in or about February 2011.  The account was a *discretionary account*, such that Defendants (*not* Ms. Alzado) were charged with selecting investments on her behalf based on her stated investment objectives and risk tolerance.  Under this arrangement, it was Defendants' duty to select only those investments that were *suitable* for Ms. Alzado.

21.      Ms. Alzado informed MSI that she had "limited" investment knowledge and, due to her advanced age and station in life, gave specific *written* instructions to Defendants on how they were to invest her account.  Ms. Alzado expressly instructed Defendants that the investment objectives she wanted to govern her account were "Capital Appreciation" (but *not* the riskier "Trading Profits" or "Speculation"), and that she was only prepared to accept "Moderate Risk."

22.      Defendants confirmed in writing that they that understood Ms. Alzado's stated investment goals and risk tolerance, and that they would make investments in her account consistent with her written instructions.  Defendants expressly confirmed her investment profile as "Capital Appreciation/Moderate Risk."

23.      Ms. Alzado also expressly instructed Defendants that they were *not* to consider any outside investments in the management of this subject account.  Plaintiff's Client Information Form instructed that the assets to be managed here were *not* to be managed under an "overall portfolio" strategy.  Defendants own documents confirm this instruction.  As a result, under FINRA Rules, Defendants were "*prohibited*" from considering any outside investment in their

management of the one subject account. *See e.g.* FINRA Regulatory Notice 12-25. Defendants have recently informed Plaintiff that, contrary to her written instructions and applicable regulations, they did in fact consider outside investments, including the separate IRA account of her now deceased husband.

**B.    Changes to Investment Profiles Must Come From Clients "In Writing"**

24.    To avoid confusion and after-the-fact fabrications, changes to a client's investment profile must come from the client "in writing." The contracts at issue here *require* that any changes to a client Investment Profile be provided *by the client in writing*. The Investment Agreement states that changes must be provided by the client by "written instruction" and that the parties "must agree to any changes in writing." The Brokerage Agreement similarly requires that the client notify Defendants "in writing" if there is "*a material change in your financial condition or investment objectives*." At no time did Ms. Alzado inform Defendants that she wanted to increase her investment risk, her investment objective, or that she wanted to switch to an overall portfolio investment strategy.

25.    Ignoring Ms. Alzado's written instructions, Defendants invested her *entire* account funds in undiversified, high risk, wildly speculative foreign mining stock. In fact, most of the securities Defendants purchased into Ms. Alzado's account were extremely high risk OTC stock. Contrary to MSI's own Written Supervisory Procedures, Ms. Alzado's account was never even pre-approved for OTC stock.

26.    As a result of Defendants' misconduct, Ms. Alzado lost most of her retirement savings. When Ms. Alzado opened her account, she had $232,330.57. When she closed it, Defendants left her with only $22,386.82. Had MSI and the other Defendants managed Ms. Alzado's account in accordance with her instructions and the duty of care with which they are charged, Ms. Alzado's account would have been worth over $500,000.00.

27.    Ms. Alzado was not Defendants' only victim. Through industry regulator investigations and private attorney investigations, it was discovered that Defendants engaged in a pattern and practice of blatantly ignoring clients' instructions and FINRA's "Know Your

1   Customer" Rule and "Suitability" Rule (FINRA Rules 2090 and 2111).  Instead, Defendants

2   implemented a "one size fits all" investment strategy which consisted of uniformly investing

3   100% or nearly 100% of clients' assets in high risk and wildly speculative foreign mining stocks.

4          28.    In fact, all of MSI's clients tied to MSI's Denver office were invested in the same

5   high risk and wildly speculative foreign mining stocks, regardless of their client profiles.  As a

6   result of these unsuitable investments, the accounts suffered drastic losses.  According to filed

7   ADV statements, these client portfolios went from a value of $60 million to $4.17 million in just a

8   few years, a drop of $55.83 million, or 93%.   By comparison, the Dow Jones Industrial Average

9   *increased* in value by approximately 53%, the S&P 500 by 62%, and the NASDAQ Composite by

10  76%.  A class action lawsuit followed.

11

12  **VI.    THE RELATED DISTRICT COURT CLASS ACTION LAWSUIT**

13         29.    On July 21, 2015, a class action lawsuit was filed against MSI in the United States

14  District Court, Northern District of California, entitled *Milliner v. Mutual Securities, Inc.,* Case

15  No. 15-cv-03354 (the "MSI Class Action").  The MSI Class Action was brought by Plaintiffs

16  Charlotte Milliner and Joanne Brem, on their own behalf and on behalf of all others similarly

17  situated, who fell victim to the false written promises and "one size fits all" investment approach

18  implemented by MSI and its registered representatives.  A copy of the MSI Class Action

19  Complaint is attached hereto as Exhibit 1.

20         30.    As described in detail in the MSI Class Action Complaint, MSI implemented a

21  systematic "one size fits all" investment strategy which consisted of uniformly investing clients'

22  assets in high risk and wildly speculative foreign mining stocks.  MSI failed to employ a

23  diversified strategy at any time, failed to avoid wildly speculative OTC stocks and penny stocks,

24  and failed to make adjustments to its clients' portfolios to reflect current market conditions.

25  Contrary to its duties, MSI failed to supervise its registered representatives and systematically and

26  categorically failed to make any suitability determinations.  As a result, clients' portfolios suffered

massive losses.

31. The District Court resolved many of the core issues in the MSI Class Action through various summary judgment rulings.[2] This includes rulings confirming that MSI owed Plaintiffs the duties of care alleged in the Complaint, and rejection of MSI's core alleged defenses. In particular, the Court established that:

- Under the suitability clause contained in MSI's Brokerage Agreement, '*MSI owed Plaintiffs a contractual duty to "determine the suitability of any investment recommendations and advice*" in accordance with the express terms of their Brokerage Agreement.'"

- MSI owed Plaintiffs a duty to supervise the outside advisory investment activities of Bock and Evans pursuant to FINRA rules: "*This Court holds that the NTMs accompanying FINRA Rule 3280 undoubtedly establish that MSI had a duty to supervise Bock and Evans' outside advisory investment activities.*"

- MSI's duty to supervise includes the specific duty to determine the suitability of the investments: "*This duty to supervise includes a duty to determine suitability as well.*" "*MSI had a duty to determine the suitability of Bock and Evans' recommended transactions.*"

A significant aspect of the Court's rulings was the rejection of MSI's contention that it did not owe a duty to supervise Bock and Evans because they were also Investment Advisers:

"These arguments [by MSI] also fail. Notably, none of the above-mentioned NTMs, nor the Commission's interpretation of these NTMs, recognize a distinction between RR/IAs acting as registered representatives or as investment advisors."

32. The Court also specifically rejected MSI's argument that the various documents, including customer agreements, somehow limited MSI's obligations, stating that "*a broker-dealer cannot contract itself out of its SRO obligations*":

"Section 78cc of the Exchange Act prohibits "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, *or of any rule of a self-regulatory organization . . .*" 15 U.S.C. §78cc (2015)(emphasis added). The words of §78cc are clear: any agreement releasing a broker-dealer from complying with its obligations under FINRA rules is void as a matter of law. Here, where FINRA rules specifically require MSI to supervise the advisory activities of its registered representatives, MSI cannot argue that agreements or documents between the parties release it from its supervisory obligations under FINRA."

---

[2] A copy of the District Court's Orders is attached hereto as collective <u>Exhibit 2</u>.

33.     During the course of MSI Class Action, it was also established that MSI did *nothing* to supervise these accounts.  MSI admitted, under oath, that it never:

- calculated the portfolio turnover of the accounts. (Cohen depo p.63:13-22)
- monitored whether the accounts were diversified.  (Cohen depo p.63:23-64:7)
- made any effort to ensure that the accounts were periodically rebalanced. (Cohen depo p.63:8-18)
- reviewed the customer monthly account statements. (Cohen depo p.64:19-65:2)
- evaluated whether customers were elderly. (Cohen depo p.65:3-5)
- calculated whether the accounts were concentrated in illiquid or risky investments. (Cohen depo p.65:9-20)
- determined the turnover ratio for the accounts. (Cohen depo p.95:6-8)
- did anything to address the decline in the value of the portfolios. (Cohen depo p.103:24-104:1)
- modified or restricted any transaction that was recommended by its registered representatives in connection with the accounts.  (Cohen depo p.106:17-107:4)
- calculated what percentage of the portfolios' holdings were OTC stocks. (Cohen depo p.124:22-24)[3]

34.     MSI also admitted that the portfolios it supervised were loaded with OTC stocks, and that it failed to comply with applicable laws, including FINRA Rule 2114, which imposes additional and heightened suitability review requirements when purchasing OTC Stock:

Q:  Are you familiar with FINRA Rule 2114 regarding OTC Equity Securities?
A:  Yes.
Q:  Did MSI follow and comply with FINRA Rule 2114 with respect to the…accounts?  Let's start with a yes or no.
A:  No. [4]

Q:  At any point in time, did MSI determine whether OTC Equity Securities were suitable for any class member account?
A:  No…[5]

MSI has also admitted that it did not "pre-approve" any account for OTC stock, as required by its own Written Supervisory Procedures:

Q: You agree, then, that no class member account -- there was no OTC Equity Securities form completed for any class member account?
A: Yes….[6]
* * * *

---

[3] The Deposition Testimony of Julie Cohen, MSI's Chief Compliance Officer, is attached hereto as Exhibit 3.
[4] MSI Deposition Testimony p.96 (Exhibit 4)
[5] MSI Deposition Testimony p.150 (Exhibit 4)
[6] MSI Deposition Testimony p.49 (Exhibit 4)

**COMPLAINT**

Q: So no class member account was pre-approved for OTC Equity Securities, correct?
A: Yes; that is correct. [7]

Ultimately, MSI admitted that the investments simply were *not* suitable:

Q: …do you have any facts to dispute that the investments made into the account of any class member was not suitable?
A: No.[8]

Given the significant and irreducible financial risk of these securities, and Defendants' complete failure to determine suitability, it is no surprise that the investments failed.

35.    On June 1, 2018, prior to the Court ruling on class certification, the parties participated in a Court ordered and supervised settlement conference.  At the conference, MSI asserted that it had limited insurance funds because its insurance company was deeming the Class Action lawsuit as a "single claim" under the insurance policy, regardless of the number of harmed customers, and effectively invited that the claims be pursued individually.  As a result, Ms. Milliner and Ms. Brem settled their *individual* claims against MSI, and dismissed the class claims *without prejudice*.  By the terms of the Settlement, any and all claims held by putative class members, like Ms. Alzado, were preserved, such that they could separately pursue their claims. By operation of law, the class action lawsuit tolled the applicable statute of limitations for all persons encompassed by the class complaint, including Ms. Alzado and all other absent class members.  *See e.g. American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), where the United States Supreme Court held that the timely filing of a class action tolls the applicable statute of limitations for *all* persons encompassed by the class complaint.

## VII.    DEFENDANTS' DUTIES OWED AND DUTIES BREACHED

### A.    Defendants Owed a Duty to Select Only "Suitable" Investments

36.    Defendants' owed a duty to Ms. Alzado to select only those investments that were *suitable* for her.  This duty was owed under *both* the written contracts, and under the FINRA Rules that govern their conduct.[9]

---

[7] MSI Deposition Testimony p.50 (Exhibit 4)
[8] MSI Deposition Testimony p.143 (Exhibit 4)
[9] "Congress has vested the Financial Industry Regulation Authority…with the power to promulgate rules that, once adopted by the SEC, have the force of law."  *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 673 (9th Cir.2013)(citing 15 U.S.C. §78s(b).

37.     When Ms. Alzado opened her IRA account, MSI provided her with a Brokerage Account Customer Agreement ("Brokerage Agreement") through which MSI identifies "the various account administration functions" that it was agreeing to perform.  Through the "suitability clause", MSI expressly represented to Ms. Alzado that:

> *As your broker/dealer, we will: determine the suitability of any investment recommendations and advice."[10]*

38.     MSI made a similar promise to Ms. Alzado through a separate document entitled "Statement of Responsibilities."  Through this document, MSI represented that "MUTUAL SECURITIES INC is responsible for":

> *"Determining whether any investment advice or recommendations given to you by your investment representative or its employees are suitable to you..."*

MSI also had a duty to determine suitability under the FINRA Rules.

**B.     FINRA Rules 2090 and 2111–The "Know Your Customer Rule" and the "Suitability Rule"**

39.     FINRA is a Self Regulated Organization under the Exchange Act, 15 U.S.C. §78c(a)(26) (2015), and also "the primary regulatory body for the broker-dealer industry." *Godfrey v. Fin. Indus. Regulatory Auth., Inc.*, No. CV16-2776 PSG(PJWx), 2016 WL 4224956, at *2 (C.D. Cal. 2016).  FINRA is responsible for regulatory oversight of all securities firms that do business with the public and, to achieve its objectives, the organization may propose rules aimed at governing its member firms and associated individuals.  *Sacks v. Sec. Exch. Comm'n*, 648 F.3d 945, 948 (9th Cir.2011).  Indeed:

> "Congress has vested the Financial Industry Regulation Authority . . . with the power to promulgate rules that, once adopted by the SEC, *have the force of law*."

*McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 673 (9th Cir.2013)(citing 15 U.S.C. § 78s(b)). As a condition of FINRA membership, members agree "to comply with the federal securities laws, the rules and regulations thereunder, . . . the Rules of [FINRA], and all rulings, orders,

---

[10] A copy of the Brokerage Agreement is attached hereto as <u>Exhibit 5</u>.

directions, and decisions issued and sanctions imposed under the [FINRA Rules]." FINRA

Bylaws art. IV, §1(a)(1).

40.     FINRA Rule 2090, the "Know Your Customer Rule", states that "every member

shall use reasonable diligence in regard to the opening and maintenance of every account, to

know (and retain) the essential facts concerning every customer…"

> **2090. Know Your Customer**
> Every member shall use reasonable diligence, in regard to the opening and maintenance
> of every account, to know (and retain) the essential facts concerning every customer…

This Rule dovetails with FINRA Rule 2111, the Suitability Rule, which states that "a member or

associated person must have a reasonable basis to believe that a recommended transaction or

investment strategy involving a security or securities is suitable for the customer…"

> **2111. Suitability**
> (a) A member or an associated person must have a reasonable basis to believe that a
> recommended transaction or investment strategy involving a security or securities is
> suitable for the customer, *based on the information obtained through the reasonable
> diligence of the member or associated person to ascertain the customer's investment
> profile.* A customer's investment profile includes, but is not limited to, the customer's age,
> other investments, financial situation and needs, tax status, investment objectives,
> investment experience, investment time horizon, liquidity needs, risk tolerance, and any
> other information the customer may disclose to the member or associated person in
> connection with such recommendation.[11]

41.     FINRA has clarified that Rule 2111 is composed of three main obligations:

reasonable-basis suitability, customer-specific suitability, and quantitative suitability:

- reasonable-basis suitability (a broker must perform reasonable diligence to
  understand the nature of the recommended security or investment strategy involving
  a security or securities, as well as the potential risks and rewards, and determine
  whether the recommendation is suitable for at least some investors based on that
  understanding);

- customer-specific suitability (a broker must have a reasonable basis to believe
  that a recommendation of a security or investment strategy involving a security or
  securities is suitable for the particular customer based on the customer's investment
  profile); and

---

[11] As FINRA Regulatory Notice 11-02 indicates, these two rules work hand-in-hand, and make clear that a
broker must have a firm understanding of both the product and the customer.  They also make clear that
the lack of such an understanding itself violates the suitability rule.

- quantitative suitability (a broker must have a reasonable basis to believe that a series of recommended securities transactions are not excessive).[12]

FINRA has also made clear that "[s]uitability obligations are *critical* to ensuring investor protection and promoting fair dealings with customers and ethical sales practices,"[13] and that the duty to determine suitability cannot be disclaimed.[14]  Defendants completely failed in this critical function.

### C.    The Investments Defendants Selected for Ms. Alzado's Account Were *Not* Suitable

42.      Ms. Alzado had a "moderate" risk tolerance, and was seeking "capital appreciation" but *not* through "trading profits" or "speculation."  Defendants completely disregarded the stated objectives and risk tolerance by investing 100% or nearly 100% of her entire account balance in undiversified, high risk, wildly speculative foreign mining stock, thus violating the three main suitability obligations.

### 1.   Defendants Loaded Plaintiff's Portfolio with Unsuitable OTC Stock

43.      Defendants breached their duty by loading their clients' accounts, including Ms. Alzado's account, with OTC stocks.

> Q: …MSI has previously admitted in this case that certain specified securities were, in fact, OTC stock. Are you aware of that?
> A: Yes.
> Q: There were a lot of them, right?
> A: Yes.
> Q: Do you have any basis to dispute that those OTC stock, stocks that were identified as being OTC, were purchased into the -- consistently purchased into the accounts of the class members?
> A: No.[15]

Defendants have recently admitted that the vast majority of the stocks they purchased into Plaintiff's account (identified below), were, in fact OTC Stock:

---

[12] *See* FINRA RULE  2111, Supplementary Material .05.
[13] FINRA Rule 2111, Supplementary Material .01.
[14] *See* MSJ Orders, Exhibit 2, ECF No.87 at p.5:3-4, citing FINRA Rule 2111, Supplementary Material .02.
[15] MSI Deposition Testimony p.147:17-148:3 (Exhibit 4).  In addition, after being ordered by the Court to do so, Defendant admitted that the majority of these stocks were OTC stocks.  *See* Order compelling Defendant to response to requests for admissions re OTC stock (ECF No. 77).

- 14 -

| Company Name | Symbol |
|---|---|
| Argentex Mining Corp | AGXM |
| Argentex Mining Corp | AGXMF |
| Ashburton Ventures Inc. | ASHXF |
| Aura Silver Resources Inc | AUSVF |
| Bear Creek Mining Corp | BCEKF |
| Condor Resources Inc. | CNRIF |
| Canadian Zinc Corp | CZICF |
| Decade Resources Ltd | DECXF |
| Dolly Varden Silver Corp | DOLLF |
| Eskay Mining Corp | ESKYF |
| Excellon Resources Inc | EXLLF |
| Full Metal Zinc Ltd | FLMTF |
| Hunt Mining Corp | HMXZF |
| Huldra Silver Inc | HUSIF |
| Intl Northair Mines | INNHF |
| Mountain Boy Minerals Ltd | MBYMF |
| Mountain Lake Resources | MLKRF |
| Pretium Resources Inc | PXZRF |
| Sabina Gold & Silver Corp | SGSVF |
| Silver Grail Resources Ltd | SVGAF |
| Teuton Resources Corp | TEUTF |
| Tumi Resources Ltd | TUMIF |
| US Silver Corp | USSIF |
| Ucore Rare Metals Inc. | UURAF |

44.     Defendants' own Written Supervisory Procedures Manual acknowledges that OTC stocks are non-conventional investments requiring a heightened level of scrutiny, characterizing them as "higher risk," "subject to volatile price changes," and "difficult to liquidate."  The point was confirmed by MSI in deposition:

- 15 -

**COMPLAINT**

Q: Okay. According to MSI's written supervisory procedures, MSI identifies OTC Equity
Securities as being nonconventional investments; is that correct?
A: Uhm-hum, yes.
Q: OTCs are nonconventional investments, right?
A: Yes; that they are not subject to any registrations to the SEC.
Q: And OTC stocks require a heightened level of scrutiny, correct?
A: Yes.
Q: They are higher risk, correct?
A: Yes.
Q: And they are subject to volatile price changes?
A: Yes.
Q: And OTC stocks are difficult to liquidate?
A: Certain -- certain one of them.
Q: Certain OTC stocks are difficult to liquidate?
A: Yes.[16]

**2.    Defendants Failed to Comply with FINRA Rule 2114: the OTC Suitability Rule**

45.    Given their high-risk, the FINRA Rules impose additional and heightened

suitability review requirements when purchasing OTC Stock:

**2114. Recommendations to Customers in OTC Equity Securities**

Preliminary Note: The requirements of this Rule *are in addition to other existing member
obligations* under FINRA rules and the federal securities laws, *including obligations to
determine suitability* of particular securities transactions with customers and to have a
reasonable basis for any recommendation made to a customer.  This Rule is not intended
to act or operate as a presumption or as a safe harbor for purposes of determining
suitability or for any other legal obligation or requirement imposed under FINRA rules
and the federal securities laws.

**a) Review Requirement**
No member or person associated with a member shall recommend that a customer
purchase or sell short any OTC Equity Security, unless the member has reviewed the
current financial statements of the issuer, current material business information about the
issuer, and made a determination that such information, and any other information
available, provides a reasonable basis under the circumstances for making the
recommendation.

Defendants have *admitted* that they failed to comply with this Rule:

Q:  Are you familiar with FINRA Rule 2114 regarding OTC Equity Securities?
A:  Yes.
Q: Did MSI follow and comply with FINRA Rule 2114 with respect to the class member
accounts?  Let's start with a yes or no.

---

[16] MSI Deposition Testimony p.162 (Exhibit 4)

**COMPLAINT**

A: No.[17]

46.     Had Defendants reviewed the business information and financial statements of these foreign mining companies, as they were required to do by FINRA Rule 2114, they would have confirmed that these OTC securities were high risk, highly speculative, and unsuitable. These are some of the mining company stocks Defendants selected for Ms. Alzado's account:[18]

**Alexco Resource Corp.**
Mineral exploration, evaluation and development *involves a high degree of risk* and few properties which are explored are ultimately developed into producing mines.  The Corporation has not yet consistently achieved positive operating cash flow, and there are no assurances that the Corporation will not experience negative cash flow from operations in the future. The Corporation has incurred net losses in the past and may incur losses in the future and will continue to incur losses until and unless it can derive sufficient revenues from its mineral projects. Such future losses could have an adverse effect on the market price of the Corporation's common shares, which could cause investors to lose part or all of their investment.

**Condor Resources, Inc**.:  The Company is engaged primarily in the business of evaluating, acquiring and developing natural resource properties in Chile and Peru. The Company is an *exploration stage* company and *has produced no revenues to date*.  At February 29, 2012 the Company had a deficit of $13,740,324. The Company expects to incur losses for at least the next 24 months. The Company's continuing operations, as intended, are dependent upon its ability to obtain financing and to generate profitable operations in the future. *There can be no assurance that the Company will ever make a profit*.

**Decade Resources Ltd.**:  Decade Resources Ltd. is in the *exploration stage* and is engaged in the acquisition and exploration of mineral properties in the Golden Triangle area of British Columbia.  To date, the Company has been able to fund operations and mineral property exploration through equity financings. The continued volatility in the financial equity markets may make it difficult to raise capital through the private placements of shares. *The junior mining industry is considered speculative in nature* which could make it even more difficult to fund. While the Company is using its best efforts to achieve its business plans by examining various financing alternatives, there is no assurance that the Company will be successful with its financing ventures. The business of mineral deposit exploration and extraction involves a *high degree of risk*. Few properties that are explored ultimately become producing mines. At present, none of the Company's properties has a known commercial ore deposit.

**Dolly Varden Silver Corp**.: The Company is a ….resource exploration company in the business of acquiring, exploring, and developing exploration and evaluation assets. The Company currently *has no producing properties and consequently no operating income*.  The Company's projects are at the exploration stage and *have not generated any revenue* other than interest earned.  The Company was incorporated on March 4, 2011 and *has yet to generate a profit* from its activities. The Company will be subject to all of the business risks and uncertainties associated with any business enterprise, including the risk that it will not achieve its growth objective. The Company anticipates that it may take several years to achieve positive cash flow from operations. Even if the Company does undertake exploration activity on its exploration and evaluation assets,

---

[17] MSI Deposition Testimony p.96:8-14 (Exhibit 4).
[18] Defendants did not provide this information to Ms. Alzado.  It was obtained independently through the efforts of Counsel.

there is no certainty that the Company will produce revenue, operate profitably or provide a return on investment in the future.

**Excellon Resources, Inc**. is a primary silver mining and exploration Company.  The Company's current activities are exploring, developing and mining the high-grade silver-lead zinc mineralization on its 40,854-hectare Platosa Property ("Platosa") located in northeastern Durango State, Mexico.  The Company is *exposed to many risks* in conducting its business, including but not limited to: metal price risk since the Company derives its revenues from the sale of silver, lead and zinc; foreign exchange risk since the Company reports in United States dollars but operates in jurisdictions that use other currencies; the inherent risk of uncertainties in estimating Mineral Resources; political risk associated with operating in foreign jurisdictions, environmental risks and risks associated with labour relations issues.

**Huldra Silver Inc.** is a *junior exploration company* engaged in the business of identification, acquisition and exploration of mineral property interests. The Company presently has no proven or probable reserves and on the basis of information to date, it has not yet determined whether its properties contain economically recoverable ore reserves. Consequently, the Company considers itself to be an *exploration stage company*. As at December 31, 2012, the Company had an accumulated deficit of $29,188,156 (December 31, 2011 - $14,750,436) and a working capital deficiency of $14,566,791 (December 31, 2011 - $3,534,299 deficit) including current debt obligations of $13,411,298 (December 31, 2011 - $5,283,228). These factors represent a material uncertainty that may cast a significant doubt about the Company's ability to continue as a going concern.

**Mountain Boy Minerals**: The Company is in the *exploration stage* and is in the process of exploring and developing its mineral properties and has not yet determined whether these properties contain reserves that are economically recoverable.  At November 30, 2010, the Company *has not achieved profitable operations*, has accumulated losses of $4,684,385 since inception and expects to incur further losses …all of which casts substantial doubt about the Company's ability to continue as a going concern.

**Sabina Gold and Silver**
Natural resource exploration generally involves a *high degree of risk*, which even a combination of experience, knowledge and careful evaluation may not be able to overcome.  The business of exploration for minerals involves a *high degree of risk*. Few properties that are explored are ultimately developed into producing mines.
*No History of Commercial Production and No Revenue from Operations.*  The Company has no commenced commercial production on any of its mineral resource properties. As such, the Company is subject to many risks common to such enterprises, including under-capitalization, cash shortages, limitations with respect to personnel, financial and other resources and lack of revenues. *There can be no assurance that significant losses will not occur in the near future or that the company will be profitable in the future.*

**Silver Grail Resources Ltd**. (the "Company") is an *exploration stage* company and is in the business of acquiring, exploring and dealing in mineral properties in the province of British Columbia, Canada. There has been no determination whether properties held contain economically recoverable ore reserves.  As at March 31, 2012, the Company has *no source of recurring revenue, generates negative cash flows from operating activities, and has an accumulated deficit of $5,542,386.* These factors raise substantial doubt about the Company's ability to continue as a going concern.

**U.S. Silver Corp.**: Mining exploration, development, and operations are *highly speculative*. They are characterized by a number of significant risks, which even a combination of careful evaluation, experience and knowledge may not eliminate including, among other things, unprofitable efforts resulting not only from the failure to discover additional mineral deposits but from finding mineral deposits which, though present, are insufficient in quantity and quality to return a profit from production.  Mining operations generally involve a *high degree of risk*.

As self described, these stocks were "highly speculative, "high risk," and simply not suitable for Ms. Alzado.

47.     Defendants have admitted that they did *not* determine whether OTC Stock was suitable for Ms. Alzado or any of the Class Members:

> Q: At any point in time, did MSI determine whether OTC Equity Securities were suitable for any class member account?
> A: No…[19]

Defendants have also admitted that they did not "pre-approve" any account for OTC stock, as required by its own Written Supervisory Procedures[20]:

> Q: You agree, then, that no class member account -- there was no OTC Equity Securities form completed for any class member account?
> A: Yes….[21]
>                         * * * *
> Q: So no class member account was pre-approved for OTC Equity Securities, correct?
> A: Yes; that is correct.[22]

Finally, Defendants have admitted that the investments simply were *not* suitable:

> Q: …do you have any facts to dispute that the investments made into the account of any class member was not suitable?
> A: No. [23]

### 3.     Defendants Failed to Disclose any Material Information Regarding the OTC Stocks

48.     Defendants owed a duty to disclose to Plaintiff all material information relating to the stocks *they* purchased into Plaintiff's accounts.  *See e.g. Dirks v. SEC*, 463 U.S. 646, 654, 103

---

[19] MSI Deposition Testimony p.150 (Exhibit 4).
[20] MSI's Written Supervisory Procedures, 13.4.4. and 13.4.4.1 require that accounts be "pre-approved" for OTC stock. They also state that failure to complete the OTC Suitability Form can result in "cancellation of the transactions and assessment of resulting losses to the RR."
[21] MSI Deposition Testimony p.49:21-24 (Exhibit 4).
[22] MSI Deposition Testimony p.50:3-5 (Exhibit 4).
[23] MSI Deposition Testimony p.143:9-12 (Exhibit 4).

S.Ct. 3255, 3261, 77 L.Ed.2d 911, 921; *Chiarella v. United States,* 445 U.S. 222, 232, 100 S.Ct. 1108, 1116, 63 L.Ed. 2d 348; *S.E.C. v. Rogers,* 790 F.2d 1450 (9th Cir.1986).  Failure to disclose material information in connection with the purchase or sale of securities is a violation of the Securities Act of 1934, §10(b) and FINRA Rules.

49.    Failure to disclose such material information is also fraud.  *See e.g. NASD Dept of Enforcement v. Dane Stephen Faber*, Disciplinary Proceeding No. CAF010009 (May 3, 2002)(*Failure to disclose* the speculative nature of a recommended security or negative financial information about the issuer violates the anti-fraud provisions of the securities laws and NASD rules.); *In the Matter of the Application of MITCHELL H. FILLET*, For Review of Disciplinary Action Taken by FINRA, SECURITIES EXCHANGE ACT OF 1934, Release No. 75054 / May 27, 2015 ("we sustain FINRA's findings that Fillet's material misstatements and *failures to disclose material information* violated NASD Rules 2120 and 2110 and IM-2310-2. We also sustain FINRA's findings that Fillet's failure to disclose material information violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) thereunder.")

50.    Here, Defendants have recently admitted that they failed to disclose any material information regarding the securities they were purchasing into Plaintiff's account, including their high level of risk:

> "*[Defendants] did **not** provide* any prospectuses, current financial statements, current material business information, FINRA Rule 2114 review, or audited current financial statements to Mrs. Alzado-Lotz concerning the OTC securities purchased in her MSI account."

FINRA's predecessor, the NASD, has specifically held that these very documents are "*material*." *See e.g. NASD Dept of Enforcement v. Ryan Mark Reynolds*, Complaint No. CAF990018 (June 22, 2001)("[A] company's 'financial condition, solvency, and profitability' [are] clearly material.")

**4.    No Diversification; No Quantitative Suitability**

51.    The portfolio Defendants selected for Ms. Alzado was also *not* Quantitatively Suitable, as required by FINRA Rule 2111.  These high risk OTC foreign mining stocks were not simply peppered into the portfolio, but rather constituted the entire portfolio.  It is uniformly

1  recognized that "diversification" is a characteristic of prudent investment.[24]  It is generally

2  accepted that a portfolio will have less volatility (i.e., less extreme price movement) when

3  the investments within it are negatively correlated, and thus individually have different

4  price reactions to economic variables, such as inflation, world events, commodities

5  prices, consumer spending, business investment, or unemployment rates.[25]  To do

6  otherwise is, at minimum, to recommend an "irrational [investment] strategy."[26]

7      52.    The Uniform Prudent Investor Act reflects that "the long familiar requirement that

8  fiduciaries *diversify* their investments has been integrated into the *definition of prudent investing*,"

9  and that the words "prudence" and "diversification" are now synonymous.[27]  Accordingly,

10  suitability includes the duty to diversify and avoid over-concentration (i.e. *quantitative*

11  *suitability).*

12      53.    Case law overwhelmingly supports the duty to diversify,[28]  and concludes that

13  over-concentration, the antithesis of the well-diversified portfolio, results in unsuitability.  The

14  SEC and self-regulatory bodies have also consistently found that highly concentrated portfolios,

15  such as those at issue here, are unsuitable.[29]

16

17  [24] See PRUDENT INVESTOR ACT SUMMARY, THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS, http://uniformlaws.org/ActSummary laws.

18  As a further example, the 1992 Restatement of Trusts took the significant step of integrating the diversification requirement into the concept of prudent investing. Section 227(b) of the 1992 Restatement

19  treats diversification as one of the fundamental elements of prudent investing.

[25] See Richard P. Booth, *The Suitability Rule, Investor Diversification, and Using Spread to Measure Risk,*

20  54 Bus. Law 1599, 1605-06 (1999)("Rational investors diversify. By investing in a diversified portfolio, an investor can eliminate as much as ninety percent of the risk that goes with investing in an individual stock

21  without any sacrifice of expected return.").

[26] Booth, *supra* note 13 at 1599, 1606.

22  [27] *See* Prefatory Note 4 to the Uniform Prudent Investor Act.

[28] *See* Annot., Duty of Trustee to Diversify Investments, and Liability for Failure to Do So, 24

23  A.L.R. 3d 730 (1969) & 1992 Supp. at 78-79.

[29] *See e.g. See In re Holland*, Exchange Act Rel. No. 36621, 52 S.E.C. 562, 566 (Dec. 21,

24  1995)(the concentration of high risk and speculative securities in the customer's account was *not*

*suitable*.), aff'd 105 F.3d 665 (9th Cir.1997); Daniel R. Howard, No. C11970032, 2000 NASD

25  Discip. LEXIS 16. at *19 (NASD Nov.16, 2000)(the "recommendations also led to an undue concentration of these speculative securities [approximately 90 percent of the customer's

26  holdings], making the recommendations particularly unsuitable.").  *In re Rafael Pinchas*, Exchange Act Rel. No. 41816, at 10-12 (Sept. 1, 1999)("the suitability rule can be violated if a representative's recommendations are quantitatively unsuitable.")  Over-concentration or "the breach of the duty to diversify constitutes an independent basis of liability, separate from a breach of the general duty of prudence." *Liss v Smith*, 991 F. Supp. 278, 301 (S.D.N.Y. 1998).

55.     Defendants breached their suitability duty by failing to diversify Ms. Alzado's portfolio.  Instead, Defendants invested 100% or nearly 100% of Ms. Alzado's entire account balance in the *same* sector: high risk, wildly speculative foreign mining stock.  In a disturbing admission, MSI's Chief Compliance Officer, testified that she doesn't even know what quantitative suitability is:

> Q: Can you tell me what "quantitative suitability" means?
> A: Quantitative? I do not know what that is.[30]

MSI's Chief Compliance Officer also admitted that the complete lack of diversification of a portfolio makes it unsuitable:

> Q: …My question is, here's an investment profile, right?
> A: Yes.
> Q: And it says "capital appreciation" and "moderate," right?
> A: Yes.
> Q: Based on this information, is a portfolio that doesn't reflect any diversity whatsoever consistent with the investment profiles? Yes or no.
> A: No.[31]

In sum, Defendants admittedly breached their suitability duty by failing to ensure that the investments met the reasonable-basis suitability, customer-specific suitability, and quantitative suitability requirements of FINRA Rule 2111.


**D.     Defendants' Conflicts of Interest and Self Dealing**

56.     It has recently been discovered that Defendants Bock, Evans (and their related trusts and entities, including Bock Evans Financial Counsel Ltd.), and Defendant Voss, all held accounts at MSI.  This includes, but is not limited to MSI Account Nos. 0FN-XXX398, 0FN-XXX230, 0FN-XXX925, 0FN-XXX915, 0FN-XXX645, 0FN-XXX622, 0FN-XXX863, and OK5-XXX140.

57.     It appears that Defendants were investing in the same thinly traded securities as their customers, including Plaintiff.  This situation created a conflict of interest and resulted in self-dealing, including front running, to the detriment of Defendants' clients, including Plaintiff.

---

[30] MSI Deposition Testimony p.98:7-9 (Exhibit 4).
[31] MSI Deposition Testimony p.135:4-13 (Exhibit 4).

Defendants were aware of these issues, and despite their compliance and supervisory obligations, failed to disclose this fact to their customers, and failed to take appropriate action.

## VIII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
BREACH OF CONTRACT

58.   Plaintiff hereby incorporates each of the paragraphs of this Complaint as though fully set forth herein.

59.     Plaintiff and Defendants entered into a contract at or about the time the Account was opened.  This included the Brokerage Agreement and the Statement of Responsibilities.[32] Plaintiff has performed all conditions, covenants, and promises required on her part to be performed in accordance with the terms and conditions of the contract.

60.     Through their contract, Defendants specifically and expressly agreed that they would determine the suitability of any investment recommendations and advice.  Through the Brokerage Agreement, Defendants represented and agreed that: "*As your broker/dealer, we will: determine the suitability of any investment recommendations and advice.*"  Through the Statement of Responsibilities, MSI represented it was "responsible for" "*Determining whether any investment advice or recommendations given to you by your investment representative or its employees are suitable to you...*"

61.     Through their contract, Defendants agreed that they would invest Ms. Alzado's funds, and manage her account, in light of her stated personal investment objectives and personal risk tolerance.  Defendants further agreed that they would continuously monitor the current market and economic conditions and continuously review her Account in light of these conditions to ensure that her holdings would continue to meet her investment objectives and risk tolerance. Defendants further agreed that they would manage Ms. Alzado's Account in accordance with the rules and regulations of the securities industry and FINRA.

---

[32] *See e.g.* Exhibit 5.

62. In this regard, the District Court in the MSI Class Action previously ruled that:

> "…there is no genuine dispute of material fact that, under the suitability clause, MSI owed Plaintiffs a contractual duty to 'determine the suitability of any investment recommendations and advice' in accordance with the express terms of their Brokerage Agreement."[33]

63. The District Court further ruled that MSI "recommended" each of these investment transactions, stating:

> "FINRA and the SEC have held that registered representatives who effect transactions on a customer's behalf without informing the customer have implicitly recommended those transactions, thereby triggering application of the suitability rule."

> "In short, pursuant to FINRA regulations, *MSI had a duty to determine the suitability of Bock and Evans' recommended transactions*."[34]

64. Defendants breached their contract, including the covenant of good faith and fair dealing, by, among other ways, failing to follow Plaintiff's stated investment instructions, failing to determine the suitability of the investments, failing to disclose material facts and information regarding the securities purchased, sold and held, including their level of risk, purchasing and holding unsuitable investments in unsuitable concentrations without appropriate asset allocation contrary to Plaintiff's risk tolerance, failing to use any significant risk management strategy, and failing to continuously monitor the market and economic conditions and continuously review her Account in light of these conditions to ensure that her holdings would continue to meet her investment objectives and risk tolerance.

65. As a result of Defendants' breach of contract, Ms. Alzado has suffered damages in an amount in excess of $500,000.00.

## SECOND CLAIM FOR RELIEF
### BREACH OF DUTY

66. Plaintiff hereby incorporates each of the paragraphs of this Complaint as though fully set forth herein.

67. By virtue of the relationship between Ms. Alzado and Defendants, a relationship

---

[33] *See* Order, Exhibit 2, EFC No.39 at page 4-5.
[34] *See* Order, Exhibit 2, ECF No.87 at p.5-6.

**COMPLAINT**

was created whereby Ms. Alzado placed her trust, confidence, and reliance on Defendants'

professed expertise in making investments decisions on her behalf.  Defendants' duties included,

but were not limited to, the duty of loyalty, the duty to deal fairly and honestly with Ms. Alzado,

the duty of full disclosure, the duty to determine suitability, the duty to supervise, and the duty to

act in the utmost good faith and in the best interest of Ms. Alzado.

68.    Defendants breached said duties by, among other ways, failing to follow Plaintiff's

stated investment instructions, failing to determine suitability, purchasing and holding unsuitable

securities in unsuitable concentrations without appropriate asset allocation contrary to Ms.

Alzado's investment objectives and risk tolerance, failing to use any significant risk management

strategy, and failing to disclose material facts and information regarding the securities purchased,

sold and held, including their level of risk, failing to supervise, failing to prevent self-dealing, and

considering outside investments without Plaintiff's consent.

69.    These duties cannot be altered by Defendants' finger pointing.  As succinctly stated

by the District Court in MSI Class Action:

> "The core, relevant (and undisputed) facts are that (1) MSI was a broker-dealer
> registered with FINRA; (2) Bock and Evans were registered representatives of MSI;
> and (3) MSI approved the outside advising activities of Bock and Evans. *These three
> facts establish MSI had a duty to supervise the advisory activities of Bock and Evans.*
> This duty would not be altered by documents about "who was giving the Plaintiffs
> investment advice and recommendations, and in what capacity."[35]

70.    Defendants also cannot circumvent their statutory duties, whether by contract or

otherwise.  As previously stated by the District Court:

> …a broker-dealer cannot contract itself out of its SRO obligations. Section
> 78cc of the Exchange Act prohibits"[a]ny condition, stipulation, or provision
> binding any person to waive compliance with any provision of this chapter or
> of any rule or regulation thereunder, *or of any rule of a self-regulatory organization . . .*"
> 15 U.S.C. § 78cc (2015) (emphasis added). The words of §78cc are clear: any
> agreement releasing a broker-dealer from complying with its obligations under FINRA
> rules is void as a matter of law. Here, where FINRA rules specifically require MSI to
> supervise the advisory activities of its registered representatives, MSI cannot argue that

---

[35] *See* MSJ Orders, Exhibit 2, ECF No.52 at p.18:3-12.

agreements or documents between the parties release it from its supervisory obligations under FINRA.[36]

71.    As a result of Defendants' breach of their duties, Ms. Alzado has been damaged in excess of $500,000.00.

72.    In committing the acts described herein, Defendants acted maliciously, fraudulently, and oppressively, thereby entitling Ms. Alzado to recover punitive damages in an amount according to proof.

## THIRD CLAIM FOR RELIEF
### FINANCIAL ELDER ABUSE

73.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as though fully set forth herein.

74.    Ms. Alzado is 66 years old, and during all times at issue here, was an "elder" and "older adult" as defined by the various Elder Protection Statutes.[37]  The stated purpose of these Elder Protection Statutes is to protect a particularly vulnerable portion of our population from mistreatment, including from financial exploitation.[38]  Defendants knew that Ms. Alzado was an elder/older adult under the protection of these statutes.

75.    By virtue of the relationship between Ms. Alzado and Defendants, a relationship was created whereby Ms. Alzado placed her trust, confidence, and reliance on Defendants' expertise in making investments decisions on her behalf.  Ms. Alzado trusted that Defendants

---

[36] See Order, Exhibit 2, ECF No.52, at page 15.

[37] Defendants managed Ms. Alzado's account from 2011 to 2019.  She lived in Colorado at all relevant times.  MSI is a California Corporation with its principal office in California.  The Brokerage Agreement states that Massachusetts law governs the agreement (except with respect to its conflict of laws provisions), as well as rules, guidelines and customs of the marketplace, and applicable state and federal laws.  Colorado, Massachusetts and California all have Elder Protection Statutes.  See e.g. ALM GL ch. 19A, §§1 through 26; Cal. Welf. & Inst. Code §15600.  FINRA Rules prohibit the use of choice of law provisions to limit a customer's rights or remedies, or limit the ability of an arbitrator to make an award for all damages suffered by a customer.

[38] "Financial exploitation" includes acts or omissions which cause a substantial monetary or property loss to an elderly person, or causes a substantial monetary or property gain to the other person, which gain would otherwise benefit the elderly person but for the act or omission of such other person.

would comply with all applicable FINRA Rules, including the "know your customer," suitability, and supervision rules, and that they would determine the suitability of the investments as they promised through their written contract.

76.     Defendants knew that Ms. Alzado trusted and relied upon them to ensure that the investments were suitable for her and in accordance with her stated investment goals and risk tolerance.  Defendants betrayed that trust by making promises they never intended to keep and deviating from acceptable standards of care, all to Ms. Alzado's detriment.

77.     By their actions, Defendants are responsible for elder abuse because they knew or should have known that their harmful conduct was directed toward a senior citizen, and because they caused Ms. Alzado to suffer a substantial loss of the funds he had set aside for retirement, which funds were essential to her personal and family health and welfare.

78.     Defendants' treatment of Ms. Alzado, as described above, resulted in harm to Ms. Alzado, entitling her to the remedies provided by the Elder Protection Statutes, which include but are not limited to compensatory damages, treble damages, punitive damages, and attorneys' fees and costs.

79.     In committing the actions and conduct described in this Complaint, Defendants, and each of them, acted with recklessness, oppression, fraud, and malice, thereby entitling Ms. Alzado to an award of exemplary or punitive damages pursuant to the Elder Protection Statutes.

80.     In addition, Ms. Alzado has incurred, and will continue to incur, attorney's fees and costs in this action. Ms. Alzado is entitled to recover such fees and costs from Defendants, under the provisions of the Elder Protection Statutes.

**FOURTH CLAIM FOR RELIEF**
NEGLIGENCE

81.  Plaintiff hereby incorporates each of the paragraphs of this Complaint as though fully set forth herein.

82.  The regulatory organizations of which Defendants are members, including the SEC and FINRA, have set forth rules and regulations that Defendants must comply with for the benefit of their investor customers, including Ms. Alzado.  These rules and regulations, as well as

applicable common law, set forth a standard of care owed by Defendants to Ms. Alzado. Pursuant to this standard of care, Defendants owed a multitude of duties to Ms. Alzado, including but not limited to:  the "know your customer" duty, the duty to learn and disclose all essential facts relative to every security purchased, sold and held in Ms. Alzado's Account, including their level of risk, the duty to chose investments that are suitable to Ms. Alzado, and to properly supervise and monitor Ms. Alzado's Account to ensure continued compatibility with Ms. Alzado's stated investment objectives and risk tolerance, the duty to avoid self dealing and conflicts of interest.

83.     Defendants were negligent and failed to use reasonable care and diligence in the handling of Ms. Alzado's Account, and breached the imposed standard of care by, among other ways, failing to  "know their customer,"  by purchasing and holding unsuitable securities in unsuitable concentrations without appropriate asset allocation contrary to Ms. Alzado's stated investment objectives and risk tolerance, failing to use any significant risk management strategy, failing to disclose all material facts and information regarding the securities purchased, sold and held, including their level of risk, failing to supervise, failing to prevent self-dealing, and considering outside investments without Plaintiff's consent.

84.     As a result of Defendants' negligence, Ms. Alzado has been damaged in an amount in excess of $500,000.00.

**FIFTH CLAIM FOR RELIEF**
FRAUD BY MISREPRESENTAT1ON AND OMISSION

85.  Plaintiff hereby incorporates each of the paragraphs of this Complaint as though fully set forth herein.

86.  Defendants promised Ms. Alzado that they would manage her Account and invest her funds with consideration of her stated personal investment objectives and personal risk tolerance. Defendants specifically and expressly represented that they would determine the suitability of any investments that were made on her behalf.  *See* Brokerage Agreement; Statement of Responsibilities.  Defendants promised to follow her instructions that her funds be invested with moderate risk of loss.  Defendants further promised that they would handle her Account in

1   accordance with the rules and regulations of the securities industry, including FINRA.

2   Defendants further promised that they would continuously monitor the current market and

3   economic conditions and continuously review her Account in light of these conditions to ensure

4   that her holdings would continue to meet her investment objectives and risk tolerance.

5        87.    At the time Defendants made the above-referenced promises and representations to

6   Ms. Alzado, they knew them to be false as they had no intention of performing them.  The true

7   facts are that Defendants purchased and held unsuitable securities in unsuitable concentrations

8   without appropriate asset allocation contrary to Ms. Alzado's investment objectives and risk

9   tolerance.  Defendants failed to use any significant risk management strategy, and failed to

10  disclose material facts and information regarding the securities purchased, sold and held,

11  including their level of risk. Defendants did not handle Ms. Alzado's Account in accordance with

12  the rules and regulations of the securities industry, including FINRA.  Defendants did not

13  continuously monitor the current market and economic conditions and did not continuously

14  review her Account in light of these conditions to ensure that her holdings would continue to

15  meet her investment objectives and risk tolerance.

16      88.    Defendants made these representations with the intention of inducing Ms. Alzado

17  into opening and maintaining her Account with Defendants.  In addition, when Defendants

18  omitted disclosing to Ms. Alzado material facts of the unsuitable risk of the securities they

19  purchased, sold and held, they did so with the intent to deceive and defraud Ms. Alzado and to

20  induce her to act in the manner herein alleged.

21      89.    Ms. Alzado justifiably relied on Defendants' false representations.  At the time the

22  promises were made and at the time she took the actions herein alleged, Ms. Alzado was unaware

23  of Defendants' secret intention not to perform and Ms. Alzado could not, in the exercise of

24  reasonable diligence, have discovered Defendants' secret intentions.  Plaintiff reasonably relied

25  on these representations by opening and maintaining her Account with Defendants.  Ms. Alzado

26  was unaware of Defendants' omissions of material fact.  Had she known the actual facts, she

would not have opened nor maintained the Account with Defendants.

90.     As a result of Defendants' fraud, Ms. Alzado has suffered damages in an amount in excess of $500,000.00.

91.     In committing the acts described herein, Defendants acted maliciously, fraudulently, and oppressively, thereby entitling Ms. Alzado to recover punitive damages in an amount according to proof.

## SIXTH CLAIM FOR RELIEF
### FAILURE TO SUPERVISE AND CONTROL

92.  Plaintiff hereby incorporates each of the paragraphs of this Complaint as though fully set forth herein.

93.     Under applicable law, including standards imposed by the SEC and FINRA, Defendants had a duty to properly supervise and control their officers, registered representatives, agents and employees, and failed to do so.  *See* e.g. FINRA Rule 3110, stating that "Each member shall establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules.  Final responsibility for proper supervision shall rest with the member."

94.     The SEC has made clear that supervision is an essential function of a broker-dealer. "It is *critical* for investor protection that a broker establish and enforce effective procedures to supervise its employees." *Donald T. Sheldon*, Exchange Act Release No. 31475, 52 SEC Docket 3826, 3855 (November 18, 1992), *aff'd* 45 F.3d 1515 (11th Cir.1995).  Establishment of policies and procedures alone is not sufficient to discharge supervisory responsibility.  It also is necessary to implement measures to monitor compliance with those policies and procedures.  *Thomson & McKinnon*, Exchange Act Release No. 8310, 43 S.E.C. 785, 788 (May 8, 1968).

95.     The SEC and FINRA have also made clear that ultimate responsibility for a broker-dealer's compliance resides with its chief executive officer and senior management.  *Frederick H. Joseph*, Exchange Act Release No. 32340, [1992-1993 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,200, 54 SEC Docket 283, 290 (May 20, 1993).  *Senior management* has a *duty* not only to provide a meaningful supervisory structure, but also to actively monitor and enforce it.  *Rita H.*

*Malm*, Exchange Act Release No. 35000, 58 SEC Docket 121, 133-134 (November 23, 1994); *Gary E. Bryant*, Exchange Act Release No. 32357, 54 SEC Docket 431, 442 (May 24, 1993). *It is incumbent upon management* to ensure that branch managers, registered representatives, or any other firm employees do not ignore procedures. *Bryant*, 54 SEC Docket at 442*; Sheldon,* 52 SEC Docket at 5255.

### A Plethora of Red Flags

96.     The duty of supervision includes the responsibility to investigate "red flags" that suggest that misconduct may be occurring and to act upon the results of such investigation.  Here, there were numerous "Red Flags" over many years, and Defendants, including the Supervising Principals and senior management, blatantly ignored them.  These "Red Flags" included Exception Reports that were generated month after month, reflecting that *all* of the accounts in Defendants' Branch Office in Colorado, including Plaintiff's account, were being loaded with high risk and highly speculative OTC stock.  The reports also showed that these accounts were being decimated, dropping *$55.83 million in value* in just a few years, *a drop of 93%.*  These massive losses occurred during a time when the rest of the market was doing exceedingly well.  By comparison, the Dow Jones Industrial Average *increased* in value by approximately 53%, the S&P 500 by 62%, and the NASDAQ Composite by 76%.  Yet Defendants, including Voss, Jasper, Sabol, Damiani, Cohen and Evans, who were supposed to be keeping watch, stood by and did nothing.

97.     As a result of Defendants breach of their duty to supervise and control their employees, representatives and agents, Ms. Alzado has suffered damages in an amount in excess of $500,000.00.

### SEVENTH CLAIM FOR RELIEF
VIOLATION OF FEDERAL AND STATE SECURITIES LAWS;
FINRA RULES

98.     Plaintiff hereby incorporates each of the paragraphs of this Complaint as though fully set forth herein.

99.     Defendants' wrongful conduct, as alleged herein, constitutes violations of Federal and State securities laws, including but not limited to Sections 10 and 20 of the Securities and Exchange Act of 1934 and Rule l0(b)-5 promulgated there under, and Section 12(2) and Section 15 of the Securities Act of 1933.  Defendants' wrongful conduct also constitutes violation of State Securities laws, including Massachusetts General Law Chapter 93A (Consumer Protection Act)[39]; and Massachusetts Uniform Securities Act, G. L. c. 110A, §410 et.seq.; Section 11-51-123 of the Colorado Securities Act; FINRA Rules 2090, 2111, 2114, 3110, 3270, 3280; California Corporations Code Sections 25401, 25500, 25501, 25504.

100.     Section 10(b) of the Securities Exchange Act of 1934 and its implementing rule, 10b-5 broadly prohibit fraud in connection with the purchase and sale of securities. §10(b) and its State analogues, makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Like section 10(b) of the Exchange Act, section 11-51-123 of the Colorado Securities Act (§11-51-123, 4B C.R.S. (1987);17 C.F.R. § 240.10b-5 (1992)), and Massachusetts Uniform Securities Act (G. L. c. 110A, § 410 (*a*) (2)), make it unlawful for any person, in connection with the purchase or sale of a security, to engage in a course of business which operates as a fraud upon any person.

101.     As alleged herein, Defendants made material misrepresentations and omissions in connection with the purchase of securities into her securities account.  In fact, Defendants have admitted that they failed to provide Plaintiff with any material information relating to the high risk and wildly speculative securities they were purchasing into her account.

102.     The securities Defendants' purchased into Plaintiff's account were unsuitable, and Defendants knew they were unsuitable in light of Plaintiff's stated objectives and risk tolerance. Defendants failed to disclose to Plaintiff any material information relating to these securities in order to conceal their high risk and speculative nature.  Defendants' acts and omissions were

---

[39] A demand letter was sent to Defendants in accordance with the Massachusetts Consumer Protection Act.  Under the Act, Defendants were required to make a reasonable offer of settlement within 30 days or be subject to up to treble damages upon judgment.  Defendants failed to comply.

1    committed with scienter; willfully and/ or with a highly reckless disregard for the truth and

2    Plaintiff's interests.  Defendants had actual knowledge of the materially false and misleading

3    statements and material omissions alleged herein and intended thereby to deceive, manipulate and

4    defraud Plaintiff, and/or acted with a high degree of reckless disregard for the truth.

5           103.    Ms. Alzado justifiably relied on Defendants' false representations and/or

6    omissions and was unaware of the true facts, which Defendants concealed.  Plaintiff reasonably

7    relied on Defendants' representations and/or omissions.

8           104.    Plaintiff has suffered damages are a direct and proximate result of Defendants acts

9    and omissions, in an amount of at least $500,000.00.  By reason of the conduct alleged herein,

10   Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the

11   Exchange Act and Rule 10b-5 promulgated thereunder, and its State Securities law counterparts.

12

13                              **EIGHTH CLAIM FOR RELIEF**
                           For Violations of Section 20(a) of The Exchange Act
14                                  (Against the Control Defendants)

15          105.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as though

16   fully set forth herein.

17          106.    This Count is asserted against Defendants MSI, Evans, Sabol, Voss, Damiani,

18   Jasper, and Cohen as Control Defendants for violations of Section 20(a) of the Exchange Act, 15

19   U.S.C. §78t(a).  Under Section 20(a) of the Securities Exchange Act, any person who directly or

20   indirectly "controls" another person found liable for a violation of the Securities Exchange Act or

21   any regulation thereunder is jointly and severally liable, to the same extent as the controlled

22   person, to any person to whom the controlled person is liable.

23          107.    In the context of this section, brokerage firms control their brokers and registered

24   representatives. *See e.g. Landry v. Hemphill, Noyes & Co., Inc.,* 473 F.2d 365 (1st Cir.), *cert.*

25   *denied,* 414 U.S. 1002, 94 S. Ct. 356 (1973).  As demonstrated herein, Defendants failed to

26   maintain or enforce a reasonable and proper system of supervision and internal control over

controlled persons so as to prevent violations of §10(b) and Rule 10b-5.

108.    The Control Defendants were, and acted as, controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of the MSI Defendants' relationship with Bock and Evans, their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, and their supervisory and compliance obligations, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Bock and Evans and the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Defendants were provided with and/or had unlimited access to copies the Company's reports, including Exception Reports, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Defendants' acts, and failure to act, were intended to further the fraud and/or prevent its discovery.

109.    In addition, each of the Control Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

110.    As set forth above, the Control Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Control Defendants are liable pursuant to §20(a) of the Exchange Act.

111.    Plaintiff has suffered damages as a direct and proximate result of these Defendants' wrongful conduct in the amount of at least $500,000.00.

## IX.    RELIEF REQUESTED

WHEREFORE, Plaintiff seeks judgment against Defendants, jointly and severally, as follows:

a.    For compensatory damages in an amount according to proof, including market adjusted damages;

b.      For rescission;

c.      For lost opportunity costs, including market adjusted damages;

d.      For treble damages;

e.      For commission and management fee disgorgement;

f.      For attorneys' fees and costs;

g.      For costs of suit and all other recoverable costs and expenses to the fullest extent allowed by law;

h.      For interest at the maximum legal rate from the earliest possible date on all sums awarded;

i.      For exemplary and punitive damages in an amount according to proof, and

j.      Such other and further relief as may be just and proper.


Dated:  September 24, 2020                THE LAW OFFICES OF DAVID STURGEON-GARCIA

                                         By:      *David Sturgeon-Garcia*
                                                  David Sturgeon-Garcia, Esq.
                                                  On Behalf of Plaintiff Janice Alzado-Lotz


## DEMAND FOR JURY TRIAL

Pursuant to Fed.R.Civ.P. 38(b), Plaintiff demands a trial by jury for all causes of action, claims or issues in this action which are triable as a matter of right to a jury.


Dated:  September 24, 2020                THE LAW OFFICES OF DAVID STURGEON-GARCIA

                                         By:      *David Sturgeon-Garcia*
                                                  David Sturgeon-Garcia, Esq.
                                                  On Behalf of Plaintiff Janice Alzado-Lotz